Fourth Division

October 8, 1998

No. 1-97-3754

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE

) CIRCUIT COURT OF

Plaintiff-Appellee, ) COOK COUNTY.

)

v. )

)

BENJAMIN SMITH, ) HONORABLE

) MARCUS R. SALONE,

Defendant-Appellant. ) JUDGE PRESIDING.

JUSTICE WOLFSON delivered the opinion of the court:

After the State's only eyewitness to the home invasion was questioned by the lawyers, the judge in this bench trial asked him questions about his ability to see without his glasses.  Then the judge conducted a brief courtroom experiment.  Minutes later, the judge found the defendant guilty.

The issue on appeal is whether, under the circumstances, the judge committed reversible error.  We find he did not and we affirm the defendant's conviction and sentence.

FACTS

Defendant Benjamin Smith (Smith) was charged with home invasion and armed violence in connection with events which occurred on September 27, 1996.  On August 15, 1997, Smith was tried before the bench.  The only eyewitness to the crimes, 74-

year-old Charles Willis, testified.  He was the only witness to appear at the trial.

Willis said he lived alone in a first-floor apartment at 7247 South Harvard.  On the evening of September 27, 1996, he was roused from his bed at about 9 p.m., when his doorbell rang.  When he opened the door, two men pushed their way into the apartment.  Willis made an in-court identification of Smith as one of those two men.

When he opened the door, Willis said, Smith was standing in front of the second man, whom Willis described as tall.  This taller man was holding a gun, which he pointed at Willis' forehead.  Willis said the taller man pushed Smith through the door, demanded money, and threatened to kill Willis if he didn't do as he was told.

Willis said he walked to his bedroom, followed by the two men.  There he retrieved a $20 bill from a shoe and gave it to the taller man with the gun.  The taller man then reached into the shoe and pulled out a second $20 bill.  After this transaction, the taller man turned over the gun to Smith, who then pointed the gun at the back of Willis' head and told him to lie face down across the bed.  Smith also told Willis to close his eyes.

While Willis remained on the bed, with Smith holding a gun to his head, he could hear the taller man in the kitchen, rifling through the freezer.  After a short time, Smith left the bedroom.  Willis got up from the bed and looked out through his bedroom door into the dining room.  He saw Smith take a shaving kit off the dining room table as Smith made his way to the front door.  Willis said the shaving kit contained some medicine, two bank books, and a key ring.  The key ring held the keys to Willis' car, Willis' sister's Atlanta home, and her car.  There was some testimony regarding the theft of Willis' car the following night, but no connection was made between the theft and Smith.

After the two men left the apartment, Willis said, he tried to call the police.  He discovered, however, the wires on his telephone had been disconnected.  Willis waited until the next day to notify the police about the break-in.

No police officer testified at trial about the report Willis made or about the line-up procedure.  All that was revealed at trial, by way of stipulation, is that Detective Lanahan, if called, would testify that 24 days after the break-in, on October 20, 1996, Smith was arrested and, during his transport to the police station, attempted to flee.

Willis testified he viewed a line-up on the same day as Smith's arrest, October 20, 1996.  Willis said he picked Smith out of a line-up and identified him as the shorter of the two men who had broken into his home on September 27, 1996.  In court a picture of the line-up was admitted into evidence.  Willis placed an X over the head of the person in the picture he had selected -

- Smith.  Again, no police officer testified about the line-up.

On cross-examination, defense counsel established that Willis, who was wearing eyeglasses at trial, had not been wearing glasses when the break-in occurred on the evening of September 27, 1996.  Willis said he wore the glasses mainly for reading and sometimes when watching television.  There were no questions concerning Willis' ability to see without glasses.

On redirect, the prosecutor did not address Willis' use of eyeglasses, but asked Willis about the lighting in his apartment at the time of the break-in.  Willis said there had been some light coming through the windows from outside.  Also, he turned a light on in his dining room as he went to answer the doorbell.  Willis said he was able to see the faces of the men clearly when he answered the door.

After counsel finished questioning Willis, the court took over.  The trial judge asked Willis if he had driven to court and if he had been capable of driving his car near the time this event occurred.  Willis did not drive to court, but had been driving at the time of the robbery.  The judge then made the following inquiry:

"THE COURT:  Okay.  If you took off your glasses,

could you see where the deputy is sitting, the young

lady in the dark uniform?

A.  Yes.

THE COURT:  Could you take off your glasses and

could you see her now if you take your glasses off?

A.  Yes.

THE COURT:  Would you do that.  All right.  Can

you tell me what she's doing now?

A.  Working her fingers, got her hand up.

THE COURT:  Okay.  All right.  The record should 

reflect the deputy is 6, 7 feet from the defendant, 

-- from the witness rather and was -- did have her hand 

raised in the air, as the witness described.  And he did

so without benefit of glasses.  Okay.  You can put your 

glasses back on.  Any questions?"

Defense counsel made no objection to the trial court's examination of the witness.  Defense counsel did, however, request and receive a not guilty verdict on count II.  The trial judge agreed that count II (alleging armed violence) charged Smith with the same conduct charged in count I (alleging home invasion) and constituted double enhancement.

The State then rested its case and the defense presented no evidence.

The court, when finding Smith guilty of home invasion, said: "Let me go on to say for the record, I found Mr. Willis' testimony to be clear and convincing without impeachment.  His recollection of the events that occurred now 11 months after the event seem to be as clear as moments, hours after this tragedy where his home was invaded by this defendant and some other unknown person.  Or unidentified person.

He testified that while the lights may have been off prior to going to sleep, in response to answering the door, he did put on the light in the house.  He said it was the dining room.

He went on to give the layout of the apartment.  And if you recall, he said he was held in his bedroom which took the offenders through the illuminated dining room and into his room.

He further testified that while in his room, he observed the defendant, the defendant and the third party in the living area and also the dining area going through his shaving case which was on the edge of the dining room table which is the room where the light was turned on.

Last but not least, almost 11 months after the event and without the benefit of his glasses, Mr. Willis was able to satisfy this Court's inquiry regarding his ability to make observations in this courtroom, again without benefit of glasses.  So, I hasten to point out Mr. Willis' statement he uses his glasses for reading.  There is absolutely no question in my mind Mr. Smith was one of the 2 persons who invaded this man's home."

Later, before sentencing defendant, the court considered Smith's post-trial motion.  Smith asked that his conviction be reversed because the victim's identification testimony wasn't sufficient beyond a reasonable doubt.

The trial court denied the motion and sentenced Smith to a 15-year term of imprisonment.  

DECISION

Smith contends the trial judge erroneously assumed the role of prosecutor when he, 
sua
 
sponte
, made inquiries regarding Willis' ability to observe.  Also, because the demonstration did not mirror the conditions under which Willis viewed the men at the time of the crime, Smith says, the demonstration introduced incompetent and irrelevant evidence into the trial.  The prejudice, he says, stems from the trial court's reliance on this incompetent evidence to find him guilty.

 
Smith also contends there was insufficient evidence of his guilt.  He says Willis' identification of him was weak.  In  support of his claim he points to the trial judge's in-court test of Willis's ability to observe, which he says, "innately demonstrates the court's dissatisfaction" with the State's identification evidence.  Furthermore, because the court's examination of Willis failed to produce any competent or relevant evidence, Smith says, there was insufficient proof of guilt and his conviction should be reversed. 

The State, of course, does not agree the evidence was insufficient.  The State maintains the trial judge's questions were merely a fair and impartial means of clarifying a material issue -- Willis' ability to observe without glasses.  It urges us to find no abuse of discretion in the court's examination of Willis.

When deciding the sufficiency of evidence reviewing courts are required to consider all of the evidence in a light most favorable to the prosecution and then determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  
People v. Gilliam
, 172 Ill. 2d 484, 515, 670 N.E.2d 606 (1996).  A criminal conviction will not be overturned unless the proof is so improbable or unsatisfactory a reasonable doubt of guilt is created.  
People v. Eyler
, 133 Ill. 2d 173, 191, 549 N.E.2d 268 (1989); 
People v. Collins
, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985).

It is possible for the State to carry its burden of proving  guilt through the testimony of a single, credible eyewitness, if the witness viewed the offender under circumstances permitting a positive identification.  
People v. Johnson
, 114 Ill. 2d 170, 189, 499 N.E.2d 1355 (1986); 
People v. Zarate
, 264 Ill. App. 3d 667, 673, 637 N.E.2d 1044 (1994). 

In a bench trial, the trial judge determines the reliability of an eyewitness's identification testimony and that decision will not be reversed unless it is so contrary to the evidence as to be unjustified.  
People v. Slim
, 127 Ill. 2d 302, 307, 537 N.E.2d 317 (1989). 

Though it is the totality of the circumstances that matters, factors to be considered when determining reliability of identification testimony are: (1) opportunity for the witness to observe the offender at the scene of the crime, (2) the witness' level of attention at the time of the crime, (3) accuracy of any prior identifications, (4) the witness' level of certainty at the "identification confrontation," and (5) the time between the crime and the confrontation.  
Slim
, 127 Ill. 2d at 307-08.

Willis had a reasonable opportunity to observe the offenders -- he testified the lighting conditions were adequate to see the two men, who were in his apartment for 10 to 12 minutes.  Also, Willis' level of attention at the time of the offense appears to have been high.

But Willis' ability to see clearly was called into question.  Though Willis selected Smith from a line-up, that identification came more than three weeks after the offense.  We don't know if Willis gave police an accurate description of Smith, nor do we know (since no police officer testified) the degree of certainty Willis displayed when he selected Smith from the line-up.

We are mindful that, to sustain a conviction, it is the trier of fact, not this court, who must be convinced of defendant's guilt beyond a reasonable doubt.  At the bench trial in this case the trial judge said he found the eyewitness credible and his identification testimony sound.  We find sufficient evidence to uphold the defendant's conviction.

Because the evidence is far from overwhelming, we have carefully examined the trial court's questioning of the eyewitness. 

It is not 
per
 
se
 error for a trial judge to question a witness.  
People v. Falaster
, 173 Ill. 2d 220, 231, 670 N.E.2d 624 (1996).  Nor does a trial judge "assume the role of prosecutor merely because his questions solicit 
evidence material to the State's case."  
People v. Sutton
, 260 Ill. App. 3d 949, 959-60, 631 N.E.2d 1326 (1994).

It is well-settled that a trial judge has discretion to question a witness "to elicit the truth or to bring enlightenment on material issues which seem obscure," as long as he does so in a fair and impartial manner.  
People v. Wesley
, 18 Ill. 2d 138, 154-55, 163 N.E.2d 500 (1959); 
People v. Bedenkop
, 252 Ill. App. 3d 419, 625 N.E.2d 123 (1993).  
The appropriate scope of questioning by the court depends on the facts and circumstances of the case.  
People v. Falaster
, 173 Ill. 2d 220, 670 N.E.2d 624 (1996);  
People v. Trefonas
, 9 Ill. 2d 92, 136 N.E.2d 817 (1956).

Where, as here, a defendant is being tried without a jury, 
the danger of prejudice stemming from a judge's questioning of a witness is decreased sharply.  
People v. Gallo
, 260 Ill. App. 3d 1032, 632 N.E.2d 99 (1994).  In a non-jury trial, prejudice is shown when the tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence.  
People v. White
, 249 Ill. App. 3d 57, 618 N.E.2d 889 (1993).

In this case, the questions posed to Willis by the trial judge manifest no predisposition toward finding Smith guilty.

The court first asked Willis whether he had driven to court and whether he had the ability to drive at the time of the incident.  We don't see the point to these questions, but since there is no indication the judge used those questions and answers to them when deciding the case, their inclusion was harmless.

The next set of questions, including the courtroom test,   seems to be an attempt by the judge to clarify the material issue of Willis' ability to see without the benefit of glasses -- a matter cast into some doubt by defense counsel's efforts to impeach Willis' identification of the defendant.  The judge, therefore, was not wrong to interpose questions on this matter.

We have examined the judge's choice of test.  It neither proved nor disproved Willis' ability to identify another human being from six feet, or any other distance.  It added nothing to the question of whether Willis could have seen Smith on the night of the break-in.

Apparently, it wasn't intended to.  The judge said he was only testing Willis' "ability to make observations in this courtroom" without his glasses.  See 
Galindo v. Riddell, Inc.
, 107 Ill. App. 3d 139, 144, 437 N.E.2d 376 (1992)(when an experiment is not represented to be an enactment, but only a test of one aspect or principle directly related to the cause, exact conditions need not be duplicated).  This was not a reenactment of the crime.

The judge expressed no doubt about the witness' credibility or ability to recall events accurately.  As to Willis' identification of Smith, the court found there had been sufficient opportunity for Willis to see Smith under lighting conditions which allowed Willis to observe Smith clearly.  In rejecting defense counsel's suggestion that Willis' ability to see Smith was impaired because he had not been wearing his glasses, the court noted Willis' testimony that he used his glasses only for reading and Willis' demonstrated ability to see in the courtroom without his glasses.  The in-court test of Willis' ability to see without his glasses was one of several factors considered by the judge when deciding whether Willis had properly identified Smith as one of the men who entered his home on September 27, 1996.

The defendant contends the fact that the judge ran the test necessarily means the judge had a reasonable doubt about the defendant's guilt.  There is nothing in the judge's questions or statements that leads us to agree with the defendant.  The trial judge never expressed any doubt about the defendant's guilt, setting him apart from the trial judges in 
People v. Denton
, 256 Ill. App. 3d 403, 409, 628 N.E.2d 900 (1993) ("And so the court has some doubt as to whether or not the intention was in fact to kill Pedro Martinez ***"); and 
People v. Olson
, 3 Ill. App. 3d 240, 244, 278 N.E.2d 861 (1971) ("I don't know whether you did that or not.")  We see no reason to speculate about the judge's reasons for the test.

In 
People v. Jackson
, 250 Ill. App. 3d 192, 620 N.E.2d 1239 (1993), the judge in a bench trial questioned a defense eye-

witness about his eyesight.  The questions involved use of the courtroom.  The answers discredited the witness's ability to perceive events accurately.  Affirming the conviction, we said:

"Here, the court appears to have been genuinely confused about the type of correction Williams's eyes needed and about what he considered to be a `far' distance.  The record makes plain that it was this uncertainty that prompted her questions to Williams to expand on his explanations about his eyesight and to compare distances in the courtroom with distances between him and the shooting.  Thus, the questions cannot be held an abuse of discretion.  
People v. Jackson
, 250 Ill. App. 3d at 203.

In this case, the trial judge did not do the kinds of things that invite reversal of criminal convictions.  He did not elicit damaging inadmissible hearsay, as the judge did in 
People v. McGrath
, 80 Ill. App. 2d 229, 224 N.E.2d 660 (1967).  Nor did he frame his questions in a way that intimated an opinion as to the credibility of the witness, as the judge did in 
People v. Lurie
, 276 Ill. 630, 115 N.E. 130 (1917).

We have examined the trial judge's questions for any indication of bias, hostility, or lack of impartiality.  We find none.  For that reason, we conclude the trial judge did not abuse his discretion when he conducted the brief experiment.

We do wish to add a cautionary note:  It is an abuse of discretion for a trial judge to assume the role of an advocate.  
People v. Murray
, 194 Ill. App. 3d 653, 658, 551 N.E.2d 283 (1990).  It is a risky business for a trial judge to create and conduct an in-court experiment.  There is a temptation to become enamored with an experiment of one's own devising.  The danger is that irrelevant or unreliable evidence will be elevated to an outcome-determinant level.

We do not believe the line between legitimate questioning and assuming the role of prosecutor (
People v. McGrath
, 80 Ill. App. 2d at 236) was crossed in this case, but the imprudence of conducting unsolicited judicial experiments was demonstrated during the hearing on Smith's post-trial motion.

Recalling the test of Willis' ability to observe, the judge attributed to Willis the ability to distinguish the gender of the deputy.  The judge said:

"And I want to point out that not only was Mr. Willis without his glasses when he observed the hand movements of Deputy Wilson, who was showing a number of fingers on her hand, which Mr. Willis correctly pointed out, but also she was dressed in a uniform which exactly resembles that of a male deputy sheriff and had her hair pulled back so that it appeared to be more closely cut then (sic) some of the male deputies that I have seen in here.

Mr. Willis was not only able to identify the hand gestures but correctly identified Deputy Wilson as a woman.  That becomes relevant.  And by that I mean Mr. Willis' candor is unimpeached testimony and his ability to observe becomes relevant."

The record shows the trial judge three times mentioned the deputy's gender at trial when he asked Willis to observe her hand gestures.  ("*** the young lady in the dark uniform?")  Willis' recognition of the deputy's gender came later.

We do not think this lapse in the judge's recollection of the experiment resulted in prejudice to Smith and so reversal is not required.  See 
People v. Schmitt
, 131 Ill. 2d 128, 545 N.E.2d 665 (1989)(no reversible error even though trial judge's remarks at post-trial hearing indicated a misconception that defendant was charged on an accountability theory and the court used a flawed accountability analysis).

The trial judge's experiment was directed at defense counsel's cross-examination about eyeglasses.  The experiment was just one factor in the court's decision to reject defense counsel's attempt at impeaching Willis.  Though the judge's subsequent recollection of the experiment was faulty, what is clear is that he remained firm in his belief that Willis accurately identified Smith.

There is nothing to indicate the trial judge, when deciding Smith's guilt at trial, harbored a belief that Willis had been able to identify the deputy's gender.  The trial judge's erroneous statement at the hearing on the post-trial motion was not an indication that the verdict was based on this misconception.  Furthermore, the judge's denial of Smith's post-

trial motion was not based on the misconception, but on the judge's firm conviction that Willis had correctly identified Smith.

 
CONCLUSION

 We find that Smith received a fair and impartial trial in which he was proven guilty of home invasion beyond a reasonable doubt.  We affirm his conviction.

AFFIRMED.

SOUTH, P.J. and HOFFMAN, J., concur.